IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION


RICHARD E. BELL, JR. and
KAREN K. BELL, Individually and as Guardians
of the Property of BRIAN E. BELL,
and BRANDEN R. BELL,

        Plaintiffs,

                                 CIVIL ACTION
                                 NO. 2:14-cv-00127

vs.


FREDERIC A. ROSEN AND
JOHNSON PUBLISHING COMPANY,
LLC a/k/a JOHNSON PUBLISHING, INC.,
                     Defendants.


## AMENDED COMPLAINT

NOW COME RICHARD E. BELL, JR. and KAREN K. BELL, Individually

and as Guardians of the Property of BRIAN E. BELL, and BRANDEN R. BELL,

Plaintiffs in the above-captioned case, and, within the time permitted by

F.R.Civ. P. 15 (a)(1)(B), state their Amended Complaint against

Defendants, FREDERIC A. ROSEN and JOHNSON PUBLISHING

COMPANY, LLC a/k/a JOHNSON PUBLISHING, INC., Defendants, as follows:


## PARTIES, JURISDICTION AND VENUE

1.

Plaintiffs, RICHARD E. BELL, JR. (hereinafter "RICK BELL") AND KAREN

K. BELL (hereinafter "KAREN BELL"), bring this suit individually and as the natural parents and Guardians of the Property of BRIAN E. BELL (hereinafter "BRIAN BELL"). They, as well as their adult son, BRANDEN R. BELL (hereinafter "BRANDEN BELL"), are residents of Valdosta, Lowndes County, Georgia.

2.

Defendant, JOHNSON PUBLISHING COMPANY, LLC a/k/a JOHNSON PUBLISHING, INC. (hereinafter "JOHNSON"), is a Delaware limited liability company with its principal place of business in New Castle County, Delaware. JOHNSON can be served through its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

3.

Defendant, FREDERIC A. ROSEN (hereinafter "ROSEN"), is a resident of the state of New York and may be served at his resident address, 125 S. Manor Avenue, Kingston, NY 12301.

4.

This Court possesses subject matter jurisdiction over this claim pursuant to 28 U.S.C. §1332 in that there is complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

5.

This Court has personal jurisdiction over Defendants under the Georgia Long-Arm statute, O.C.G.A. 9-10-91(3). JOHNSON and ROSEN committed tortious injuries in this state caused by acts or omissions outside this state, and JOHNSON derives substantial revenue from subscriptions and sales of Ebony Magazine and other publications in Georgia. ROSEN likewise benefits from JOHNSON's sales of Ebony Magazine in Georgia in that, on information and belief, JOHNSON paid Rosen for the KJ Articles defined in paragraph 7 below. Rosen also benefitted as a "true crime" writer from the KJ Articles concerning alleged crimes in Georgia. Moreover, ROSEN and JOHNSON worked with a private investigator and other persons present in Georgia to gain background for the defamatory statements in the KJ articles which pertained to an alleged murder and other criminal activities in Georgia.

6.

Venue is proper in this Court pursuant to 28 U.S.C. §1391 in that JOHNSON sells Ebony Magazine and other publications in the Southern District of Georgia, including the Brunswick Division. ROSEN is subject to venue in this district since he also published the defamatory statements in this matter for profit in the Southern District Court of Georgia, and this Court may exercise pendent venue over him.

# FACTUAL ALLEGATIONS

7.

Between August 12, 2013 and April 9, 2014, JOHNSON published a series of fifteen articles in Ebony Magazine, available on its internet site, www.ebony.com, about the death of Kendrick Johnson (hereinafter the "KJ Articles"). Twelve of these articles were written by ROSEN, who has published a number of books in the "true crime" genre. Though all of the fifteen Ebony articles must be read together as a developing story, ten articles written by Rosen, attached hereto and made a part hereof as part of Exhibit "A," explain the essential background and context of the libelous statements. Virtually all of the libelous statements, except the cover-up conspiracy allegations, were made in two of the articles described below in paragraphs 10-11 and 13-15.

8.

The KJ Articles asserted that Kendrick Johnson (hereinafter "KJ"), a sophomore at Lowndes County High School (hereinafter "LCHS"), was murdered by blunt force trauma and placed in a standing gym mat in the old gym at LCHS between third and fourth blocks, shortly after 1:30 PM, on January 10, 2013. The "Who Killed Kendrick Johnson" title of the initial five Ebony articles, dated between August 12 and September 23, 2013 (Exhibit A, pp. 2, 6, 13, 18 and 23), as well as the body of the articles, state that KJ was "murdered" or "killed" (Exhibit A, pp. 15, 22, 30).

9.

Rosen's claim of murder is based upon his explanation of "suspicious circumstances" (Exhibit A, p.26) surrounding the investigation of KJ's death. Initially, the false claim is made that "his face had been beaten beyond recognition," (Exhibit A, pp. 2). In the September 23, 2013 article, Defendants refined their theory to claim that KJ "died from one powerful blow - inflicted by one person while others likely held him down." (Exhibit A, p. 23).

10.

In the November 19, 2013 article entitled "Tweets From Possible Suspects Raise Eyebrows" (hereinafter the "Tweets" article), ROSEN stated that a white sophomore LCHS high school football player, fictitiously named Chris Martin, as well as his older brother, fictitiously named Clark Martin (a LCHS senior), sent taunting or threatening tweets after the murder (Exhibit A, pp. 39, 41, 43). Then, employing fictitious interviews of them by Lowndes County Sheriff (hereinafter "LCS") detectives (Exhibit A, pp. 40-41, 22, 35-36), ROSEN falsely implied that they were possible suspects in the LCS investigation of KJ's death (Exhibit A, pp. 39-43).

11.

ROSEN also falsely suggested in Tweets that Chris Martin's motive to murder KJ was two previous fights they had (Exhibit A, p.40; described in earlier articles, Exhibit A, pp. 22, 37, 40-41) that were not revealed by

either Martin during their fictitious LCS interviews (Exhibit A., pp. 22 and 41), resulting in a "prior animus" going back at least two years (Id.). In fact, there was only one scuffle on a junior varsity bus going to a football game, and the boys had been friends since childhood.

12.

ROSEN falsely suggested that the Martin brothers may have committed a racially-motivated murder in the October 25, 2013 article, entitled "Did a Fight Lead to Kendrick Johnson's Murder" by the following language: "Did the Martin brothers hold a grudge? Did they in some way lure Johnson into a trap at the old gym? And who delivered the final blow? If the motive was racial, then it's up to Michael J. Moore, the U.S. Attorney for the Middle District of Georgia, to investigate and bring charges. It is a Federal crime to harm a person because of their race…" (Exhibit A, pp. 34, 37).

13.

ROSEN admitted in the KJ Articles that he was using pseudonyms to describe the Martin family members (Exhibit A, pp. 22, 38). The true identities of three of the Plaintiffs in this case were revealed in Tweets just after the statement that the father of the Martin brothers, fictitiously named Sam Martin, refused initially to allow LCS detectives to interview his sons: "We have been able to confirm that the elder Martin is an FBI agent." (Exhibit A, pp. 40-41). This fact, coupled with ROSEN's statement that Chris Martin was a member of the LCHS varsity football team (Exhibit A, p. 42),

unquestionably identified Chris, Clark and Sam Martin as BRIAN BELL, BRANDEN BELL and RICK BELL, to the many LCHS students, teachers and coaches who knew them and KJ.

14.

BRIAN BELL was threatened with bodily harm and ostracized by many LCHS students after the Tweets article. Such threats from various sources have continued on social media, particularly Twitter, since that time, and have been exacerbated by national news coverage of questions about suspects in KJ's alleged murder suggested in the KJ Articles.

15.

On April 9, 2014, ROSEN, reinvented his version of KJ's death yet again in a new Ebony article, "Are We Closer to Answers?" ("Answers"). Based upon a January 27, 2014 anonymous e-mail to LCS, ROSEN claimed that Chris Martin (i.e., BRIAN BELL), with the help of another unnamed classmate, murdered KJ between third and fourth block classes at LCHS on January 10, 2013, out of jealous rage after learning that KJ had had sexual intercourse with his girlfriend: "The young lady [BRIAN BELL's girlfriend] [stated] that she, 'had sexual intercourse with Kendrick Johnson [the teammate who he fought, who] found out and threatened KJ. KJ told [him] to meet him in the old gym after third block and he would have his knife ready.'" "Another student, a friend of KJ's alleged romantic rival, was also reported to be there. The result? Kendrick Johnson being killed and stuffed

in a gym mat." (Exhibit A, pp. 49-50). These defamatory statements by Defendants had no basis in fact whatsoever, as is explained in further detail below.

16.

In early 2013, following an autopsy by the Georgia Bureau of Investigation (hereinafter the "GBI"), and a thorough investigation by the LCS, KJ's death was ruled the result of accidental positional asphyxia after he became trapped in a standing gym mat while trying to retrieve a pair of tennis shoes in the old gym at LCHS.

17.

The statements in the KJ Articles that KJ was murdered by "blunt force trauma" (Exhibit A, pp. 2, 18, 23, 25 and 31) are false and without any basis in fact or reliable and unbiased expert opinion.

18.

The KJ Articles state and suggest a factual basis for a complex conspiracy to cover up the alleged murder of KJ involving numerous personnel in the LCS, the Lowndes County Board of Education, the GBI, and the Valdosta Crime Lab, as well as the Bell Plaintiffs. In the September 23, 2013, Part 5 of the "Who Killed Kenneth Johnson" articles, ROSEN explained that the failure of law enforcement to find out why KJ died was leading to a possible federal investigation of KJ's death (Exhibit A, pp. 26-27). ROSEN pointed out that U.S. Attorney for the Middle District of Georgia, Michael

Moore, had the duty look into "civil rights and state/local corruption cases...

and that Moore "could open a full-scale investigation into KJ's murder and

enforce civil rights violations. Or, he can charge those he deems responsible

with violations of the Racketeer Influenced and Corrupt Organizations Act

(RICO) (Exhibit A, p.27) (emphasis added). In his October 31, 2013 Ebony

article entitled "US Attorney opens investigation into Kendrick Johnson's

death" [not attached as Exhibit A but referred to in subsequent attached

articles (Exhibit A, pp. 47-48, 49)], ROSEN announced Moore's decision to

open such an investigation.

19.

In a November 9, 2013 Ebony article entitled "Questions Arise from

the new Footage of Kendrick Johnson" (not part of Exhibit A), JOHNSON

stated the repeated complaint of the KJ family lawyers about the

"'roadblocks they [had] encountered' in the KJ death investigation, this time

involving allegations of 'suspicious edits, blurry images and no time or date

lines' on the LCHS surveillance camera footage showing KJ entering the old

gym on the day he died. The KJ attorneys state that 'the case is starting to

look like a **cover up**.'"(emphasis in the original).

20.

In the January 17, 2014 article entitled "Will a County Sheriff Face

Charges? As the FBI and US Attorney's Office investigate the 17 year-old's

death, questions about a possible cover up persist" (Exhibit A, p. 44)

-9-

(emphasis added), ROSEN cited possible "Obstruction of Justice" charges against Lowndes County Sheriff Prine due to alleged irregularities in the KJ death investigation, implying Defendants' adoption of the alleged conspiracy to cover-up KJ's murder. (Exhibit A, pp. 47-48).

21.

Defendants' cover-up theory only works if the far-fetched conspiracy described in paragraph 18 above existed, which necessarily involved RICK BELL and his wife, KAREN BELL (fictitiously named Susan Martin in the articles)(Exhibit A, p. 41). This conspiracy theory is based upon false allegations in the KJ Articles of a botched investigation by LCS, and other allegedly suspicious circumstances that are not in fact suspicious, including the following:

a. That the Lowndes County Coroner was not notified until five or more hours after the body was discovered (Exhibit A, pp. 2, 47). This delay resulted from the time necessary for LCS to complete work at the crime scene before the body could be examined, and the Coroner agreed with the GBI autopsy finding that KJ died from accidental positional asphyxia;

b. The false claim that the body was moved from the gym and the crime scene was compromised before the coroner arrived (Exhibit A, pp. 46-47);

c. The false claim that no crime scene photographs were taken

(Exhibit A, pp. 2-3);

d. The false claim that the body was contaminated by opening the body bag prior to autopsy. Though the bag was opened to permit family identification of KJ, the body was not contaminated;

e. That KJ's organs and clothes were lost after the autopsy, destroying evidence of a possible homicide (Exhibit A, pp. 32-33). The organs and clothes were thoroughly examined and discussed in the GBI autopsy and tissue slides preserved; available clothing items were returned to KJ's family;

f. The false claim that KJ's cell phone was missing, which might have had fingerprints of the murderer (Exhibit A, p. 7);

g. The fact the autopsy report was not released for approximately three and-a-half months after KJ's death (Exhibit A, p. 7). The autopsy findings were properly delayed until the exhaustive LCS investigation was completed and closed;

h. That KJ's shoulders were too wide for him to fit into the mat (Exhibit A, p.30). When reaching into the mat for his shoes, KJ's shoulders would not have been square with mat opening;

i. The false claim that the GBI issued conflicting explanations of what KJ was doing when he died, "reading" into the mat instead of "reaching" into the mat (Exhibit A, pp. 11, 25). This was an obvious misspelling in an e-mail from a GBI official to the Lowndes County

Coroner when the autopsy results were released;

j. The false claim that the LCS should have, but did not, launch a prompt homicide investigation (Exhibit A, pp. 24, 33);

k. The false claim that the LCS obtained a statement given by Chris Martin (i.e., BRIAN BELL), but it was withheld from the LCS report: " According to the police narrative, Chris then gave a statement that not included in the police files that we [ROSEN and JOHNSON] obtained" (Exhibit A, p. 42). There was no statement by Brian Bell in the LCS file for the simple reason that neither he nor his brother Branden were ever interviewed by the LCS since they were never suspects in the investigation of KJ's death.

l. After consulting with KJ's family and their private investigator (Exhibit A, pp. 26-27, 31-32, 37-38), U.S. Attorney Moore re-opened the investigation into KJ's death as a racially-motivated murder complicated by possible "state/local corruption" (Exhibit A, pp. 26-27) in late October of 2013; however, this grand jury investigation has not resulted in any murder indictments;

m. The false claim the GBI refused to even look at the report of the pathologist hired by lawyers for the KJ family that suggested KJ was murdered and raised questions about the validity of the GBI autopsy of January 14, 2013 (Exhibit A, p. 26);

n. The private investigator hired by KJ's family in February 2013, Beau

Webster, was quoted by ROSEN as saying: "I have investigated a lot of murder cases, but none like this. I have never had a situation where I didn't get any cooperation from anyone" (Exhibit A, p, 30). However, the two Valdosta civil rights leaders who thoroughly investigated KJ's death for the local chapter of the Southern Christian Leadership Conference (hereinafter "SCLC") have denied any lack of cooperation of local authorities, believe KJ died by accident, and described the continuing claim of a cover-up to be a "witch hunt" (April 11, 2014 report to US Attorney Moore from Leigh Touchton; April 3, 2014 report to US Attorney Moore from Floyd Rose; Exhibit "C" hereto).

The allegations of a murder and cover-up in the KJ articles are false and have no factual basis.

## 22.

More importantly, regardless of how KJ died, the claim in the KJ Articles that BRIAN BELL, assisted by BRANDEN BELL or any other LCHS student, could have played any part in KJ's death in the LCHS gym is completely untrue.

## 23.

No effort was made by Defendants to verify the alibis of the BELL brothers. BRANDEN BELL was en route to a LCHS wrestling match in Macon, Georgia at the time of KJ's death. BRIAN was in class at LCHS, or walking to

class, and never entered the LCHS old gym at all on January 10, 2013, as has been verified by witnesses and LCHS video surveillance camera footage.

24.

The Answers article was based upon a January 27, 2014 anonymous e-mail to LCS that had been thoroughly discredited by reports of LCS interviews with the sender and other persons mentioned in the e-mail that were released by LCS with the e-mail well before the Answers article. The author of the e-mail recanted her story in a Valdosta Daily Times article published on March 27, 2014. In fact, BRIAN BELL had no girlfriend at the time of KJ's death, and the girlfriend he began dating later in 2013 had no personal relationship with KJ, much less a sexual relationship, at any time.

25.

As previously established, The KJ articles are replete with false and misstated "facts" from fictitious LCS interviews allegedly proving motive and opportunity for the BELL brothers to have murdered KJ. The un-redacted LCS investigative file, available under the Georgia Open Records Act, O.C.G.A. §50-18-71, et seq., was released to media sources and others prior to the Tweets article in November 2013. These factual misstatements are more particularly set forth in the demand letter of Plaintiffs' Counsel to Defendants, Exhibit "B" hereto.

Prior to and during publication of the KJ Articles, ROSEN has made a number of public appearances in the media describing and commenting upon the defamatory content of the articles, and embellishing them. One such lengthy interview took place on January 30, 2014 on the Dan Zupanzky Blog Radio show and contains defamatory statements quoted in part as follows:

> The GBI, which is notoriously corrupt... they do a pretensive investigation. During this investigation, they send a detective to interview two boys, one is 17 and one is 18. Their dad is an FBI Agent ... in charge of the Southwest Gang Task Force (this positively identifies Rick Bell, who held that position),... and the individual they send out to do [these interviews] was part of the Gang Task Force, never declares there is any conflict of interest, interviews the father, interviews the two boys, and it turns out that one of these two boys has had two fights with KJ, the only individual who they have come up with who has motive...I'm hoping to write this piece for Ebony.com which is this...I have discovered the motive, the means and the opportunity for one of these two boys that I mentioned earlier whose Daddy is an FBI agent to have killed Kendrick Johnson...Further, I have information that has come to me about why KJ walked into that gym, on January 10th, was he lured in there by somebody.

...Dr. Anderson did a dissection of the neck, he discovered that KJ dies from one blow to the neck or it could have been pressure from a wrestling hold. You remember the two kids I mentioned earlier whose Daddy was an FBI agent? Guess what, they are both wrestlers. And one of them is a brilliant football player. These are very strong capable kids (emphasis added).

In this one media appearance, ROSEN accused BRIAN and BRANDEN BELL of the murder of KJ, said that the GBI interviewed RICK BELL, BRIAN and BRANDEN BELL (a pure fiction), and suggested a conspiracy to cover up the murder due to the alleged corruptness of the GBI and the relationship of RICK BELL with his law enforcement colleagues. All of these statements about the BELLS' alleged felonious conduct are slander per se under O.C.G.A. 51-5-4(a)(1). On information and belief, JOHNSON expressly authorized ROSEN to make the defamatory statements described herein.

27.

On information and belief, ROSEN has made other media appearances in which he has repeated the defamatory statements in the KJ Articles that BRIAN and BRANDEN BELL murdered KJ, that the murder was covered up in the alleged conspiracy described above in which the entire Bell family cooperated to keep the murder secret. Also on information and belief, these statements were directed or authorized by JOHNSON.

## DEMAND FOR RETRACTION AND RESPONSE

### 28.

On April 18, 2014, counsel for the BELL Plaintiffs sent a letter to Defendants demanding a retraction of their libelous statements pursuant to O.C.G.A. §51-5-11. On May 19, 2014, Plaintiffs' counsel sent another letter to Defendants setting forth the specific retraction required by Plaintiffs. True and correct copies of these letters are attached hereto and made a part hereof as Exhibits "B" (without Exhibit "A" attachment) and "C," respectively. They were received by both Defendants.

### 29.

JOHNSON removed most of the KJ Articles from the Ebony website on May 5, 2014, but subsequently refused the written retraction demanded by the BELL Plaintiffs. ROSEN failed to respond at all to the initial BELL demand letter from Plaintiffs.

## CAUSES OF ACTION

### COUNT ONE

### LIBEL

### 30.

Plaintiffs repeat and re-allege each of the allegations in Paragraphs 1 through 29 of this Complaint as if fully set forth herein.

### 31.

A libel is a false and malicious defamation of another, expressed in

print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt or ridicule. O.C.G.A. § 51-5-1.

32.

False statements that one has committed criminal conduct amounting to a felony under Georgia law are libelous per se, that is, without the necessity of proving actual damages. Defendants have falsely accused BRIAN BELL of murder (as codified in O.C.G.A. § 16-5-1), BRANDEN BELL of being an accomplice or accessory to murder (as codified in O.C.G.A. § 16-2-20), if not also a murderer, and RICK AND KAREN BELL of conspiracy to cover up murder (as codified in O.C.G.A. §16-10-50), all of which are felonies under Georgia law. Defendants have thus committed libel per se of all Plaintiffs.

33.

A libelous charge is actionable per se whether the words directly or indirectly, by intimation or innuendo, or indirectly or by inference, contain libel. It is the harmful effect of defamatory language as it is understood which renders it actionable per se, and not its directness or unequivocal nature. In this case, the Defendants admittedly employed pseudonyms in the KJ Articles to describe the Plaintiffs. Students, faculty and coaches at LCHS could and did easily discern that the referenced LCHS football player who had a fight with KJ on a school bus was in fact BRIAN BELL, and that his

-18-

older brother was BRANDEN BELL, and that both of them were sons of FBI agent RICK BELL and his wife KAREN BELL.

34.

The statements in the Answers article which revised the theory of KJ's murder as being committed by BRIAN BELL with an unnamed accomplice, motivated by sexual jealousy, as well as the subsequent cover-up of the murder, constituted libel by innuendo of the Plaintiffs as much as the statements in the Tweets article, taken in context of all of the KJ Articles.

35.

The libelous statements were made and published in this case with actual malice, i.e., with actual knowledge by Defendants that they were false or with reckless disregard of whether they were false. Such conduct amounts to negligence as well as reckless and wanton conduct.

36.

The libelous statements contained in the KJ Articles attached in Exhibit "A" hereto were published on the JOHNSON web site, www.ebony.com, as a result of JOHNSON's sales of Ebony subscriptions in Georgia, including the Southern District of Georgia. They were also published nationally and worldwide and have resulted in national media attention to the Plaintiffs as being involved in the alleged KJ murder and cover-up. The first article containing sufficient information to identify the BELLS was the Tweets article on November 23, 2013.

-19-

37.

At all times pertinent to this Complaint in investigating, writing and discussing the libelous statements of Plaintiffs in the KJ articles, ROSEN was acting as the authorized agent of JOHNSON. JOHNSON is thus responsible for his libelous conduct under the doctrines of respondeat superior or agency, and is also responsible for its own conduct in publishing the KJ articles without any effort to verify the truth of the libelous allegations therein or with knowledge of the falsity of the allegations.

38.

All Plaintiffs have been permanently damaged by Defendants' libel of their personal reputations, and RICK BELL has been injured in his professional reputation as an FBI agent. Apart from special damages of each plaintiff that may be proven at trial, they are entitled to recover the sum of at least $3,000,000.00 in compensatory damages, or such additional sum as is determined appropriate by a fair and impartial jury in this case.

COUNT TWO

SLANDER

39.

Plaintiffs repeat and re-allege each of the allegations in Paragraphs 1 through 29 of this Complaint as if fully set forth herein.

40.

Slander or oral defamation consists, in pertinent part, of imputing to another a crime punishable by law... making charges against another in reference to his trade, office, or profession, calculated to injure him therein; or other uttering any disparaging words producing special damages which flows naturally therefrom.  O.C.G.A. § 51-5-4. The defamatory statements described herein made by Defendants have also been repeated and embellished orally by ROSEN in radio and TV shows, some broadcast on the internet, as early as June of 2013.

41.

A slander is published as soon as it is communicated to any person other than the party slandered.  In this case, the slander was published on internet radio shows involving ROSEN between October 2013 and January 2014, and possibly thereafter. On information and belief, other shows involving explanations of the Ebony articles have taken place on local television and radio stations, and in conversations ROSEN has had with bloggers via e-mail, twitter, Facebook and other social media that has been repeated on numerous occasions by other persons.

42.

A party who commits slander or libel may be held responsible for repetition of same by others if such repetition or republication by others is a natural and probable consequence of the original slander.  In this case,

Defendants knew that the false and defamatory statements they made about Plaintiff in a nationally-published magazine and via internet would be repeated by other persons. Such additional defamation is the responsibility of Defendants as the natural and probable consequence of their original statements.

43.

The libelous statements were made and published in this case with actual malice, i.e., with actual knowledge by Defendants that they were false or with reckless disregard of whether they were false. Such conduct amounts to negligence as well as reckless and wanton conduct.

44.

At all times pertinent to this Complaint in investigating, writing and discussing the libelous statements about Plaintiffs in the KJ articles, ROSEN was acting as the authorized agent of JOHNSON. ROSEN's slanderous comments were made at the direction of or with the express approval of JOHNSON. JOHNSON is thus responsible for his libelous conduct and is also responsible for its own conduct in publishing the KJ articles without any effort to verify the truth of the libelous and allegations therein or with knowledge of the falsity of such statements.

45.

All Plaintiffs have been permanently damaged by Defendants' libel in both their personal reputations, and RICK BELL has been injured in his

professional reputation as an FBI agent. Apart from special damages that may be proven at trial, they are entitled to recover the sum of at least $1,000,000.00 in compensatory damages, or such additional sum as is determined appropriate by the jury in this case.

COUNT THREE

PUNITIVE DAMAGES

46.

Plaintiffs repeat and re-allege each of the allegations in Paragraphs 1 through 29 of this Complaint as if fully set forth herein.

47.

Plaintiffs made demand for retractions by Defendants pursuant to O.C.G.A. § 51-5-11(a) through their attorneys by letters sent by certified mail as alleged in Paragraph 28 herein, allowing at least seven (7) days for responses. Defendants have refused or failed to make the demanded retractions. As a result, the jury is authorized to award Plaintiffs punitive damages if proven as required by law.

48.

Punitive damages may be awarded in tort actions in which it is proven by clear and convincing evidence that the defendant's action shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences. Punitive damages shall be awarded not as compensation to a

plaintiff but solely to punish, penalize, and deter a defendant. O.C.G.A. § 51-12-5.1(b)(c).

49.

The conduct of Defendants in this case in publishing false statements of criminal conduct by Plaintiffs, with knowledge that such statements were untrue and extremely damaging to their reputations, or publishing these false statements with reckless disregard for their truthfulness, constituted willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences entitling Plaintiffs to recover an additional amount of punitive damages to be determined in the discretion of the jury to penalize or punish Defendants for such conduct and to deter such conduct in the future. Plaintiff seeks punitive damages of at least $1,000,000 and further avers that, by clear and convincing evidence, Defendants acted with specific intent to harm Plaintiffs.

COUNT FOUR

EXPENSES OF LITIGATION

50.

Plaintiffs repeat and re-allege each of the allegations in Paragraphs 1 through 29 of this Complaint as if fully set forth herein.

51.

Pursuant to O.C.G.A. § 13-6-11, Plaintiffs seek to recover, in the discretion of the jury, their expenses of litigation, including attorney's fees, on the basis that Defendants have acted in bad faith, been stubbornly litigious, or has caused Plaintiffs unnecessary trouble and expense.

52.

The amount of expenses of litigation at the time of trial shall be proven by appropriate documents and expert testimony as required by law.

## **JURY TRIAL DEMANDED**

Plaintiffs respectfully demand a jury trial in this action.

WHEREFORE, Plaintiffs respectfully request that the Court grant them the following relief:

1.    An award of general and compensatory damages on Count One or of the Complaint for libel in the amount of $3,000,000.00 or more; and

2.    An award of general and compensatory damages on Count Two or of the Complaint for slander in the amount of $1,000,000.00 or more; and

3.    An award of at least $1,000,000 in punitive damages on Count Three of the Complaint  as determined in the discretion of the jury based upon the evidence produced at trial; and

4.    An award of expenses of litigation on Count Four of the Complaint, in the discretion of the jury, in an amount to be based upon the

documentary and expert testimony at trial regarding said expenses; and

     5.    Such other relief as is just and appropriate under the

circumstances.

     DATED this 13th day of November, 2014.


/s/M. Brice Ladson
     **M. BRICE LADSON**
     **Georgia Bar No. 431071**
     **ATTORNEY FOR PLAINTIFFS**

**Ladson Law Firm, P.C.**
**10375 Ford Avenue, St. 3**
**P. O. Box 2819**
**Richmond Hill, Georgia 31324**
**mbrice@ladsonlaw.com**
**Tel:  (912)459-1118**


/s/Patrick T. O'Connor
     **PATRICK T. O'CONNOR**
     **Georgia Bar No.  548425**
     **ATTORNEY FOR PLAINTIFFS**


/s/ Paul H. Threkeld
     **PAUL H. THREKELD**
     **Georgia Bar No. 710731**
     **ATTORNEY FOR PLAINTIFFS**

**OLIVER MANER LLP**
**218 West State Street**
**Savannah, GA  31401**
**Tel:  912-236-3311**
**pto@olivermaner.com**
**pht@olivermaner.com**